7-1168 Erico Intl v. Vutec Corp. Mr. Sprinkle? May it please the Court, my name is Doug Sprinkle and I'm here today appealing the grant of a preliminary injunction precluding the defendant from selling these hooks. These are the hooks that are in question. The interesting thing about these hooks is that this hook falls exactly within claim 1 of the Bantam Suit which everybody agrees is invalid. And it also is essentially identical to the OVO hook which everybody agrees is prior art and therefore cannot be infringed because if it did infringe, then the claim would be invalid. But this is the hook that the defendant is doing from selling. The trial court found that the defendant docks marketing and tributarily infringed claim 7 which is a method claim. And the method claim speaks for itself. The method claim in essence is 17. It's a method for supporting a low voltage communication cable using J hooks with downturn fly edges. These are the downturn fly edges. And spacing the hooks so that the cable sag between adjacent hooks is less than 30 centimeters or about a foot. Now, in opposing the preliminary injunction, we raised a number of defenses, any one of which should have been sufficient to defeat the preliminary injunction. First of all, everybody agrees that more than a year prior to the filing date of the 994 patent that installers of low voltage communication cable use open tap supports. I'm not sure what their shape was, but they would open tap support and that they would space the hooks and then pull the cables taut so that the sag between adjacent hooks was less than 30 centimeters or less than a foot. Everybody agrees that that's all. The inventor agrees. The court realized that that, in fact, had occurred more than a year prior to the filing date of the patent, but that there was no evidence that J hooks were used to support those cables. Well, the only difference between what was done before, more than a year prior to the filing date, and Claim 17 is the shape of the book itself. It's well said, in fact, it's black letter law, that in order to obtain a method, a valid method claim, that the patentability must rely upon the method itself and that the patentability of the claim cannot be predicated upon apparatus limitations appearing within the claim. And where is this black letter, where is the statute? Section 101 of Title 35 says that you can get a patent for new apparatuses or new methods. It doesn't say for old methods using new apparatus or old methods using old apparatuses, as appeared in this case, which is the OVO. Has the Supreme Court said anything new under the sun may be considered for patentability? Absolutely. They're saying unless, unless what? Provided you don't use an apparatus to carry out a method? Any new method under the sun certainly is patentable subject matter. That's exactly what the Supreme Court said, and I have absolutely no dispute with that, but the method itself must be new. And you can't simply add new apparatuses. This is the Stilago case, which is from the CCPA, it's still good law, it's still cited. Judge O'Malley gave some real attention to this, and one of the things she mentioned with regard to the validity is the evidence of secondary considerations, long felt need, commercial success, direct copying are, I think, the three that she cites to. Why doesn't that give weight to her finding? Well, the secondary considerations, commercial success, for example, have to be attributable to the claim itself. In this case, the claim says spacing the hooks apart from each other. Did you rebut the nexus? Did you have adequate evidence in the record to show that the commercial success was not linked to this particular method? No, but I think the onus goes the other way around. The commercial success, they have to link the nexus of the commercial success of the other secondary considerations to the claim itself. What was the evidence of commercial success? What was the evidence of secondary considerations? They sell a lot of them. They have testimony? Yes. They have testimony? They have testimony that they sold a lot of these hooks. That's correct. And besides that, what was the testimony? The testimony was that they sold hundreds of millions of them, and that there's no question that we copied the hook, but the hook is claim 1, and that's the path. That was what we copied. But, again, there was no nexus that was shown by the plan between the commercial success and claim 17. I think that's all that we have to show on that. So you're not saying that the hooks are in the prior art, is that right? The OBO hook is certainly prior art. The OBO hook was used by the patent office to invalidate claim 1 during the prior exhibition. Because this is what I don't understand. If the hooks are in the prior art, and if the commercial success doesn't depend on the design of the hook, why didn't your client just make the prior art hook instead of copying this one? We didn't have a copy of the OBO hook, but there's really very little difference. You had a picture in the patent. Well, that's a fact. That's what we actually made the hook. Then the OBO hook was found. I guess the only answer to that is that if something's not patentable, like claim 1 on the patent suit, there's actually nothing wrong with copying it. That's a civil decision from the Supreme Court back in the 60s. It's perfectly legitimate for you to copy something that's not patentable. Can I just run to another subject because I'm running out of time? No, proceed. Thank you. Secondly, as we submitted our brief, we viewed the court as improperly construing the claim. They construed the claim to say the communication cable includes anything that transmits data or a control signal. Now, in the prior art description, there's certainly a differentiation between HVAC systems and low-voltage communication cable. The inventor who appeared as a 30p6 witness as the person most knowledgeable about the claim language testified that low-voltage communication cable, as it's used in Claim 17, did not include HVAC systems. We have extensive evidence that Dock's hooks were used to support HVAC wire. I don't really know what the word control means or what it encompasses. It's a word that does not appear in the patent. I suppose it would encompass any electrical signal at all. If the electrical signal is connected to a strobe light, it controls the light by turning it on and off. By the very nature, all electrical signals control something. So I think that was an improper construction because the trial court would necessarily have to find that there's no substantial non-infringing use, and the substantial non-infringing use that we presented was using these hooks to support HVAC systems. So I think it's really improper construction. The other thing that we did present during the testimony was a challenge to the validity under Section 103, namely the EIA or TIA standard. I think it's really EIA slash TIA standard, which provides for the spacing of 120 centimeters. That was prior art. Judge O'Malley, it depends on the fact that this has been through re-exam. Yes. Why shouldn't we give weight to the Patent Office's re-examination of its work? I think you should give a lot of weight to the grant of the re-examination request filed by Docs Marketing that was filed, and they found that a substantial question of patentability was raised by the EIA standard or TIA standard and the OBO reference. And in writing that request for re-examination, the Patent Office found rather emphatically that the EIA standard was not before during the prior re-exam. I think you should give a lot of weight to that. The trial court gave no weight at all to that. In fact, I'm sorry. You're talking about a current re-examination? Yes. But we know that the statute says that you don't grant re-examination unless it's substantial. Those are the words of the statute, aren't they? Absolutely. I'm trying to understand what weight, what extra weight you're asking us to give to the fact that re-examination has been granted. It isn't completed, is it? No. Actually, absolutely nothing has happened other than granting the request itself. I think Judge O'Malley made a clear mistake of fact when she concluded erroneously that the EIA standard was before the Patent Office, and so therefore she gave great weight to the prior re-examination. The Patent Office concluded exactly the opposite. If we look at the patent itself, we look at what was presented, and there's an ambiguous sentence appearing in the detailed description of the invention about, in order to meet conforming standards... Wouldn't one of skill in this art have known that the conforming standard was probably the EIA alliance standard? I don't know. The conforming standard may have been that the sag should have been less than two feet. I don't know what the conforming standard was. But one of skill in the art is going to understand you don't want a lot of sag, right? Isn't that pretty... I mean, the whole point of that book is to avoid getting kinks in your lines, right? And so the whole point is you don't want sag because that gives kinks, and kinks are bad. So, I'm having trouble... Why isn't there some degree of logic in what Judge O'Malley is saying? Well, the hooks themselves, the downwardly flanges, are only described in the patent as reinforcing flanges. They're not described in any other fashion. So, why that avoids a kink any more than... No, no, we're talking about the sag question. And you're saying, well, conforming standards might not have meant 30 centimeters of sag, but I'm saying the only one of skill in the art's got to be able to figure that out, right? The whole point's to get rid of sag. The whole point's to pull a taunt. And when you say conforming standard, maybe Judge O'Malley's right. That's getting rid of the sag. Now, in that case, why wouldn't somebody take the OVO book, which was also used to support cable, The question is, why wouldn't your client take that hook, instead of copying this one? The OVO book's very close to this one. I think they would be happy if they could copy the OVO book. But they didn't, right? They copied this one. Yes, they copied their book. It seems to be preferred by the industry, and according to, apparently, the evidence. They sell a lot of books. There's absolutely no doubt about it. Okay. You're into your rebuttal. Do you want to say a bit? Yeah, let me just add one quick thing. In order to grant the reexamination request, they can't grant on old references, old prior art. We all know that. There has to be a new reference. The new reference that they used to grant the reexamination request was the EIA standard, so it was not before the Patent Office. And of course, the conclusion that it was... Of course, it was before the district court. Pardon? It was before the district court. The EIA standard? Yeah. Yes, because we brought it before the district court. Okay. I'd like to say that I have. Thank you. Okay. Mr. Campbell? Good afternoon, Your Honors. One of the things I've heard a lot about just recently... Yes, tell me now. We've got this question of obviousness. The Patent Office says that the hook itself is prior art. Okay. You agree with that? Yes. And the standard, the EIA standard, is prior art also. And so the Claim 17 doesn't seem to do anything except combine the unpatentable hook together with a method for stringing the cable, which is set forth in a prior art industry standard. How could it be, under these circumstances, that this isn't obvious, the method? Well, Your Honor, everything is a combination of old elements. Nobody comes up with really something different other than gas. But these elements are right on the money. These elements are very close, but they're not combined. Not even very close. They're right on the money. But nobody combined the before, and that's the key. And that's the key, always the patentability. Nobody ever did it before. Are you sure no one's ever done it before? I mean, if conforming standards is what one of skill in the art would have understood, why wouldn't they have been doing this before? Well, it is clear that nobody's ever done it before, and we know of that. How do you know that? We know of all that from the secondary considerations. What evidence would you show me in the record that this method had never been practiced before? The evidence that we have in the record is testimony from two different gentlemen at the hearing that Judge O'Malley had, and that was Mr. Lynch and Mr. Laughlin. And what they testified about is as soon as they made this invention, as soon as they made this combination, the industry realized, boy, this is wonderful, we love this. And immediately they rewrote the standards to include it. Immediately they adopted it. Everybody in the industry wanted to use it. It started selling from nothing to 100 million of these. I don't understand. I thought the standard was prior art. Yes, I'm sorry, there's many different standards in this art. It's not that there's one standard that covers everything. You know, in the electrical cabling industry, there may be a hundred standards. But the standard which we're talking about, the TIA standard, was modified after Errico came up with this invention to specifically talk about Errico's invention. It was that groundbreaking to them. To talk about the hook, you mean? The combination of using the hook and this novel method. Now, you have to understand that... What novel method? The novel method is the way it's used. The hook we're not saying is novel by itself. What's the novel method? Using the hook in a way that you can have sag, but you maintain the sag at less than 30 centimeters, and you do that in a way so as not to have kink. Now, you have to understand there's a lot of testimony on this. We're not a person with an ordinary skill in the art. We have to rely on what we heard, what the testimony was. The testimony was that before Errico's invention, you had problems with either kinking or you had problems with crosstalk. If you stretch these cables taut through a cable tie, for example, you have crosstalk because you have a lot of cables over a very short period. They're all parallel to each other, and you get all this interference from crosstalk, which was bad, but they had to do that because they didn't want kinking, because kinking is even worse. What kinking does is you have something other than, for example, the hook we have here. I can't tell whether that's an Errico hook or a DOCS. They're so close. But there's no mention of kinking in Claim 17, right? Not to prevent kinking, but that's what it does. All that Claim 17 is telling you to do is to take the hook and combine it with the preexisting method, right? The preexisting standard. No, that's not exactly what it says. Because, yes, the standard talked about... Well, what else does it say? In fact, Claim 17 doesn't relate to the standard at all. The standard would be in Claim 20, which is a dependent claim. What Claim 17 says is that you want to have this novel method of hanging these cables with one of these hooks with these downturned edges so that you don't get cabling. It doesn't say so you don't get cabling, but that is what you get. That's why you have the downturned methods. That's why you have less than a foot of sag. It's because you are now able to... But the method in the prior art says exactly the same thing. The hook is prior art. The method's prior art. What have you got to give you any claim that you have something novel? Well, no, the... Let alone non-obvious. The standard didn't say that you do these things to avoid kink or to avoid crosstalk. All the standard says... But the purpose is irrelevant. It's what it defines as the method, and it says to minimize the sag. No, there's no standard that says to minimize sag. The standard we're talking about is to have certain spacing. That spacing being, I would say, three to four feet. Which will minimize sag. Well, it can. Inherent. No, not inherent. One of skill in the art does not understand this. We're not talking about... We're talking about hanging... We're talking about hanging cords here. Come on. We're talking about something very simple, and that's what makes the invention all the more dramatic. And that's why you look at these secondary... What is the dramatic invention? By using Erico's hook, suddenly people realized that they could hang these cables in a way that they didn't have crosstalk. They didn't get kinking, which creates noise and feedback and interference. It's very, very important in this developing science back in the 1990s. With these cables that you don't have those... Is the hook prior art? Is the hook prior art? Yes. Is the EIA standard prior art?  But not using one of the hooks. Is skill in the art using the EIA standard and the hook by virtue of using both of them, minimize kinking and crosstalk at the same time? No, not necessarily. They could make a mistake in using them. Is that what you're saying? We have no idea what they would do, because there was absolutely no testimony that you could do these. And in fact, Mr. Sprinkle had the opportunity to bring in a person born near skill in the art to say, I would have combined these. They would have been obvious to me. He didn't do that. He didn't bring in an expert who said, I would combine them. These would be obvious to me. We're applying a standard of clear error. He was able to rely on the fact that the patent office said that when they said there was a substantial question of patentability as to the combination, right? Your Honor, approximately 97% of all reexaminations are granted. So it's not that high of a threshold. If we're going to say that all those patents are invalid, there would essentially be no patents, or no patents which are reexamined which are found to be valid. We know that's not the case, because more than 50% are never changed. I'm just trying to figure out here what in the prior art standard and the prior art book and the knowledge of ordinary skill in this art wouldn't be suggested completely by your claim? What would your claim completely be subsumed within those three? What is there outside of that? I would suggest we're looking at the wrong inquiry. The inquiry isn't what all the prior art is. The inquiry is whether you combine the prior art. And if somebody would combine all the prior art in this fashion, they would get the invention. But the key is that they didn't. And the key is that, according to the Supreme Court and KSR, we can't just grab isolated pieces of prior art. Even though we don't have the TSM test, we still have to articulate some rationale to combine them. We have had no testimony on that. But once the J-Hook comes into existence, and the standard is in existence, then isn't it obvious to combine them, since they inherently use each other? No, it's not. What is not obvious about that? It's hard for me to say, because I'm not a person of ordinary skill in the art. The persons of ordinary skill in the art testified at trial that, no, it was not obvious. We wouldn't use the J-Hook, and we wouldn't use those standards. Yes, in fact, they didn't. In fact, they had the standard before, right? And they had the J-Hook, this Oboe Betterman Hook, right? Those were all out there, but nobody ever combined them. And the reason why is because there was all these cross-purposes. And the reason is that you didn't think that that was going to work. It did have... What was taught away? As simple as it seems, there was an unexpected result. The prior art did teach away, because what the prior art said is, you wanted to pull these things so tight that you can't have kinking, because kinking was thought to be even worse than crosstalk, right? You don't want crosstalk, and you don't want the kinking, because the kinking causes all this kind of noise in these cables. And we're talking about these high-speed communication cables that run your computers and phones and TVs and cablings, things like that. You have to minimize noise to make it go fast, to get bandwidth. And what they found is that they wanted to... Since noise was really bad, they wanted to definitely minimize the kinking, because the kinking causes the noise. But then that caused problems with crosstalk, because now you're... I'm just trying to figure out... Now, see, let's assume that the new element here in the art is the downturned edges on your J-hook. Right. And the obvious purpose for the downturned edges on the J-hook are to allow you to bend the cord over the edge without causing any damage to the wire, right? No. Okay. Yeah, it doesn't seem that hard. Why is it downturned? Well, there's been no testimony, no evidence as to why it's downturned in the oboe reference. In other words, that was downturned just to maximize the strength. May I borrow your hook, sir? Yeah. The purpose of having the downturned edges... Okay, but the purpose is irrelevant. The purpose is irrelevant. The point is, once one of skill in the art has a hook with downturned edges and knows that he doesn't want to pull it too tight because that has problems and knows that he doesn't want to sag it too much because that has problems, kink on the one hand, cross-talk on the other, why isn't it obvious that he's going to use the J-hook precisely as the method tells him to use it? Well, you can't start with our method and go backwards. Oh, no, no. That's a good hindsight. The point is, these are both in the record. They're both there. Why isn't it obvious to make them dominant? Why isn't it obvious to combine them? Well, again, the standard... As soon as the J-hook comes on the market, doesn't someone recognize that's the way to use it? Obviously not, to use the term, because we know from the secondary considerations that nobody had done it. I mean, it's us trying to guess what the persons of ordinary skill would have done, but that's not proper here. The proper thing is to look at the testimony. The testimony, all the testimony, all the unrebutted testimony, was that it was not obvious, that nobody had done it before, that it had this huge commercial success once people realized it. The testimony is that it wasn't obvious because of what? What's that? Why? I mean, you have the hook, you have the standard, you put them together, you have the claim limitation satisfied. Well, we had the standard before, and we had the hook before, but nobody had done that. Nobody had combined it because they were looking at using different... So what you're saying is that there is a prima facie case of obviousness here, but the secondary considerations rebut that? No. No, I agree that if there were, the secondary considerations are unrebutted, so they would override it, but there isn't a prima facie case of obviousness, again, because nobody was motivated to combine them because there were all these cross purposes. You wanted to have different types of things, and some of the evidence in the record are these things called bridal hooks, cable ties. The cable tie you'll find in your house is one of those little plastic doodads that you wrap around something, slip one end through the other, and pull it tight. That's how they hung this cable. But why wouldn't someone have been motivated to combine them? What was the testimony as to why there was no motivation to combine? Because people were looking at doing other things because they thought that you didn't want to have me say their motivation was to completely eliminate it, to have this completely taut cable. Well, it hasn't been completely construed to that fashion, but it does say sag, and it would be our interpretation that yes, it does require some degree of sag, but less than a foot of sag. And that's what all the testimony has been. I mean, we have to, as Judge Newman pointed out, look at why they decided to copy this hook. Why they decided to use this instead of something else. Because it's important. Because the industry recognized that this is what mattered. And in fact, this wasn't just this arbitrary decision to go out and use this hook. We have to look at what Doc's Marketing really did. The first time they copied the hook so exactly it had Caddy's name on it. It had Erico's trade name on it. They realized they couldn't sell it, but they sold it anyway. Then they came back with another hook, but they just got rid of the Caddy name. Erico found out, told them, hey, you're infringing our patent. They didn't say no, we're not infringing. They didn't say no, the patent's not invalid. They said we're not going to do it. But they lied. They did it anyway. And they continued to do it. They had a right to copy the hook. It was prior art, right? Yes. They had a right to copy the hook, but they didn't have a right to sell it in the way they were. If they were just going to put these in supermarkets, that would be fine. But all the evidence is that they used it and advertised it specifically for Erico's market, specifically for using communications cable, specifically for doing it in the method. We're not suing them for making a hook. We're suing them for inducing others and contributing to other people's infringement because they're telling people you must use it in this fashion, which was Erico's market. That's what Erico got the patent for. That's what Judge O'Malley, in four very well-reasoned decisions, found justifying the injunction. Okay. Any other questions? Any other questions? Okay. Thank you, Mr. Kendall. Mr. Sprinkler. I promise to be brief. There's no finding by the court that there was inducement to infringe, strictly contributory infringement. There's absolutely no evidence in the record that Doc's Marketing told anybody how to use this hook. In fact, Doc's Marketing sells these hooks in large quantities to supply houses who then sell them to contractors. But the only question before us is whether to preserve the status quo while these aspects are litigated. They haven't yet been finally decided. Isn't that right? We're talking about likelihoods? Right. They have not been finally decided, but there's been no finding of inducement to infringe. So it's really just a question, again, of which status quo do we preserve? The status quo of the infringing activity, if I can call it that, or the status quo before Doc's Marketing entered the market. Does the J-hook have any non-infringing uses? Is it a stable article or non-stable? My view would be that the J-hook, the reason we have the name J-hook that appears in the dictionary is that it has lots of uses. I thought you told us that Judge O'Malley specifically asked for evidence of non-infringing uses. Is that correct? Judge O'Malley asked us to specify non-infringing uses in her order granting the injunction. Obviously, we could not come to an agreement on that because if we did come to an agreement on that, that would destroy the contributory infringement argument because if there's a substantial non-infringing use, there can't be no contributory infringement. Did you identify any non-infringing use? At the time that they were selling the hooks, the non-infringing use, as far as we were concerned, were restraining the HVAC lines. You mean using it as they taught because of your view that the patent was invalid? No, Your Honor. They teach using it for communication cable, which means Cat 5 cable, the stuff that you hook up to your computer. That's a different kind of cable. That's a different kind of cable than HVAC systems. Thank you. Thank you. Mr. Sprinkle, Mr. Campbell, the case is taken under submission. The two other cases will be considered on the briefs.